UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PATRICIA ANN HORNING,

                        Plaintiff,

v.                                                                 Case No. 6:14-CV-0937 (GTS)

CAROLYN W. COLVIN,
Commissioner of Social Security,

                        Defendant.
_____

APPEARANCES:                                             OF COUNSEL:

DEHANN BUSSE, LLP.                                JOHN W. DEHAAN, ESQ.
 Counsel for Plaintiff
300 Rabro Drive East
Hauppauge, NY 11788

U.S. SOCIAL SECURITY ADMIN.              ELIZABETH ROTHSTEIN, ESQ.
OFFICE OF REG'L GEN. COUNSEL – REGION II
 Counsel for Defendant
26 Federal Plaza – Room 3904
New York, NY 10278

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

      Currently before the Court, in this Social Security action filed by Patricia Ann Horning ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are the parties' cross-motions for judgment on the pleadings. (Dkt. Nos. 12, 13.) For the reasons set forth below, Plaintiff's motion is denied and Defendant's motion is granted.

## I. RELEVANT BACKGROUND

### A. Factual Background

Plaintiff was born on July 19, 1977. (T. 165.) She completed high school. (T. 194.) Generally, Plaintiff's alleged disability consists of depression, anxiety, back problems, neck problems, and knee injury. (T. 193.) Her alleged disability onset date is October 13, 2011. (T. 194.) She previously worked with the Department of Motor Vehicles as a clerk, and at a gas station as a cashier. (T. 195.)

### B. Procedural History

On December 27, 2011, Plaintiff applied for Supplemental Security Income ("SSI") under Title XVI and Disability Insurance Benefits ("SSD") under Title II of the Social Security Act. (T. 165.) Plaintiff's application was initially denied, after which she timely requested a hearing before an Administrative Law Judge ("the ALJ"). On December 27, 2012, Plaintiff appeared before the ALJ, David J. Begley. (T. 41-70) On March 22, 2013, the ALJ issued a written decision finding Plaintiff not disabled under the Social Security Act (T. 25-36.) On June 4, 2014, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 1-7.) Thereafter, Plaintiff timely sought judicial review in this Court.

### C. The ALJ's Decision

Generally, in his decision, the ALJ made the following five findings of fact and conclusions of law. (T. 25-36.) First, the ALJ found Plaintiff met the insured status requirements through December 31, 2015 and had not engaged in substantial gainful activity since October 13, 2011. (T. 27.) Second, the ALJ found Plaintiff had the severe impairments of degenerative joint disease of the left knee, disorders of the cervical and

lumbar spine, post-traumatic stress disorder ("PTSD"), major depressive disorder, and adjustment disorder with mixed anxiety and depression. (*Id.*) Third, the ALJ found Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 28-29.) Fourth, the ALJ found Plaintiff had the residual functional capacity ("RFC") to perform "light work," except:

> she may occasionally push and pull with the left lower extremity and never climb ladders, ropes or scaffolds. She must avoid slippery and uneven surfaces, hazardous machinery, and unprotected heights. She [was] limited to simple, routine and repetitive tasks in a work environment free of fast paced production requirements and involving only simple work-related decisions, with few if any workplace changes. She [was] limited to only occasional interaction with coworkers and supervisors and only superficial interaction with the public.

(T. 29.)[1]

Fifth, the ALJ determined Plaintiff was unable to perform her past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 34.)

## II. THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION

### A. Plaintiff's Arguments

Plaintiff makes two separate arguments in support of her motion for judgment on the pleadings. First, Plaintiff argues the ALJ improperly evaluated the medical evidence. (Dkt. No. 12 at 18-24 [Pl.'s Mem. of Law].) Second, Plaintiff argues the ALJ improperly evaluated Plaintiff's credibility. (*Id.* at 25.)

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. §§ 404.567(b) and 416.967(b).

3

B. Defendant's Arguments

In response, Defendant makes two arguments. Defendant argues the ALJ properly considered the evidence of record and his RFC finding was supported by substantial evidence. (Dkt. No. 13 at 5-17 [Def.'s Mem. of Law].) Second, Defendant argues the ALJ properly assessed Plaintiff's credibility. (*Id.* at 17-20.)

III. RELEVANT LEGAL STANDARD

A. Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational

interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

### B. Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. §§ 404.1620 and 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.

> If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

## IV.  ANALYSIS

### A.  Whether the ALJ Properly Evaluated the Evidence of Record.

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated in Defendant's memorandum of law. (Dkt. No. 13 at 5-17 [Def.'s Mem. of Law].) The Court adds the following analysis.

Plaintiff argues the ALJ failed to properly evaluate the opinion evidence of Dilip Kachare, M.D., Kumar Bahl, M.D., and David Stang, Psy.D. (Dkt. No. 12 at 18-24 [Pl.'s Mem. of Law].)

Plaintiff argues Dr. Kachare, Plaintiff's treating physician, deserved controlling weight pursuant to the treating physician rule. (*Id.* at 20-22.) However, the ALJ properly afforded Dr. Kachare's opinion "little weight" based on his limited treatment history and because his opinion was inconsistent with the objective medical evidence in the record (T. 33.)

The opinion of a treating source will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).

The following factors must be considered by the ALJ when deciding how much weight the opinion should receive, even if the treating source is not given controlling weight: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). The ALJ is required to set forth his reasons for the weight he assigns to the treating physician's opinion. *Id.*, *see* SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Shaw v. Charter*, 221 F.3d 126, 134 (2d Cir. 2000) (quoting *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998)).

Dr. Kachare began treating Plaintiff in June of 2011. (T. 358.) At that time Plaintiff complained of back pain and tingling in her legs, but denied weakness, numbness, joint pain, trouble walking, falls or limited movement. (T. 358.) Dr. Kachare conducted a physical exam which showed full range of motion in Plaintiff's neck and spine, no deformity or tenderness of the joints and spine, and no edema. (T. 359.) Dr. Kachare assessed Plaintiff with low back pain. (*Id.*) He prescribed Plaintiff pain medication and referred her to pain management. (T. 360.) Plaintiff was scheduled for a follow-up exam in August of 2011, but cancelled and rescheduled to December of 2011; however, the next treatment note is dated July of 2012. (T. 358.)

In July of 2012, Plaintiff returned to Dr. Kachare complaining of back pain "for the past [three] weeks." (T. 370.) Plaintiff complained specifically of "severe" back pain which radiated into her legs. (*Id.*) Plaintiff stated she was walking with help from her

7

son, but denied leg edema, joint pain, weakness, falls or limited movement. (*Id.*) Upon examination Dr. Kachare observed tenderness in her lower left back. (T. 371.) Dr. Kachare noted Plaintiff had "chronic pain syndrome with acute exacerbation due to sprain." (*Id.*) Dr. Kachare prescribed pain medication. (*Id.*)

On October 14, 2012, Dr. Kachare completed a medical source statement. (T. 397-398.) Regarding exertional limitations, Dr. Kachare opined that in an eight hour workday Plaintiff was able to occasionally lift and carry five pounds or less; frequently lift and carry five pounds or less; stand and/or walk less than two hours; and sit less than four hours. (T. 397.) In terms of non-exertional limitations, Dr. Kachare opined Plaintiff should never climb, balance, kneel, crouch, crawl or stoop. (*Id.*) Dr. Kachare noted Plaintiff could occasionally reach, handle, finger and feel. (T. 398.) He observed she had no difficulty seeing, hearing or speaking. (*Id.*) Dr. Kachare opined Plaintiff's impairments caused environmental limitations as well. (*Id.*)

Plaintiff urges the adoption of Dr. Kachare's limitations, stating the ALJ improperly relied on his sparse treatment of Plaintiff and the ALJ erroneously held that the opinion was inconsistent with objective medical evidence. (Dkt. No. 12 at 20-24 [Pl.'s Mem. of Law].) Contrary to the Plaintiff's assertion, the Regulation specifically state "frequency of treatment" is a factor ALJ's should rely on in weighting opinion evidence. 20 C.F.R. §§ 404.1527(c)(2)(i) and 416.927(c)(2)(i). Here, the ALJ properly relied on the "frequency of treatment" as one factor in weighing the opinion evidence of Dr. Kachare.

Plaintiff argues the gap in treatment should have a minimal impact on the ALJ's reasoning because the Plaintiff was being treated during that time through a pain clinic.

(*Id.* at 20.) However, despite requests and a subpoena, treatment records were never received. (T. 31, *referring to* T. 146 and 160.) Plaintiff asserts the ALJ "[held] it against" her that the records were not received. (Dkt. No. 12 at 20 [Pl.'s Mem. of Law].) However, the ALJ specifically stated he would "look upon [treatment with pain management] in the most favorable light" despite lack of treatment notes. (T. 31.) This Court will not speculate as to what the absence, or presence, of treatment notes from Plaintiff's pain clinic imply regarding Dr. Kachare's opinion. The fact is, Dr. Kachare treated Plaintiff twice, with a one year gap between the two examinations. The ALJ did not err in taking Dr. Kachare's length of treatment into consideration when evaluating his opinion, as length of treatment is expressly stated in the Regulations as an appropriate factor to be considered. Further, the ALJ did not err in failing to fill in this gap with conjecture of what was, or wasn't, in medical evidence.

Plaintiff argues subsequent records from Dr. Kachare support his medical source statement. (Dkt. No. 12 at 21 [Pl.'s Mem. of Law].) Plaintiff submitted additional evidence to the AC consisting of treatment notes from Dr. Kachare dated November 7, 2012, February 25, 2013 and March 27, 2013. (T. 453-459.) The AC held the newly submitted evidence from Dr. Kachare was not "contrary to the weight of the evidence" before the ALJ. (T. 2.) *see Rutkowski v. Astrue*, 368 Fed. Appx. 226, 229 (2d Cir. 2010); *see Bushey v. Colvin*, 552 Fed. Appx. 97, 98 (2d Cir. 2014) (finding new evidence presented to the AC did not alter the weight of the evidence so dramatically as to require AC to take the case). Plaintiff does not argue the AC erred in their review of the medical evidence.

9

Although the ALJ did not have the November 2012 treatment notes from Dr. Kachare at the time he wrote his decision, he did have before him medical evidence from Clifford Soults, M.D., the neurologist who saw Plaintiff on referral in December of 2012 and January of 2013. Dr. Soults observed severe tenderness over Plaintiff's left scapula, decreased range of motion in her cervical spine, mild weakness in her right deltoid, positive Romberg, fairly steady gait, 5/5 strength in her lower extremities, and decreased sensation in her entire left foot up to her ankle. (T. 411.) Overall, Dr. Soults opined Plaintiff's cervical and lumber MRI were "fairly unremarkable." (*Id.*) He stated cervical surgery may be a benefit "at some point" and there was no evidence of significant cord compression to correlate with her myelopathy. (*Id.*) The observations by Dr. Soults, that Plaintiff's MRI were unremarkable, she did not require surgery and there was no cord compression, are inconsistent with Dr. Kachare's severe limitations.

Dr. Kachare's limitations were also inconsistent with the medical opinion of consultative examiner, Pamela Tabb, M.D. Dr. Tabb observed Plaintiff could not flex beyond 30 degrees due to back pain, but had full extension. (T. 313.) She further noted her lateral flex was limited due to pain. (*Id.*) Dr. Tabb observed Plaintiff's cervical spine had limited flexion, extension and rotation due to pain. (*Id.*) Plaintiff's shoulders had limited abduction on the left, but full on the right. (T. 314.) Dr. Tabb noted tenderness over the patellar, but full range of motion. (*Id.*) She noted there was no edema. (*Id.*) Based on the medical evidence and her examination, Dr. Tabb opined Plaintiff had "mild restriction for performing bending, lifting heavy objects." (*Id.*) The ALJ afforded Dr. Tabb's opinion "great weight." (T. 33.)

The medical evidence supplied by Dr. Kachare, Dr. Souts and Dr. Tabb do not support the limitations imposed by Dr. Kachare in his medical source statement. The ALJ properly afforded Dr. Kachare's medical source statement "little weight," as he aptly reasoned, at the time the medical source statement was completed, Dr. Kachare treated Plaintiff twice over the span of a year and the limitations were not supported by objective medical evidence in the file.

Plaintiff also argues the ALJ failed to properly consider evidence regarding Plaintiff's leg swelling. (Dkt. No. 12 at 22 [Pl.'s Mem. of Law].) The ALJ discussed Plaintiff's allegation of leg swelling in his decision, but stated he did not account for it because he found no evidence of leg swelling or treatment for leg swelling in the record. (T. 31.) Plaintiff refers to Dr. Kachare's November 7, 2012 treatment note in support of her argument, but as previously discussed, these treatment notes were first submitted to the AC which properly found they were not contrary to the weight of the evidence. Plaintiff also points to Dr. Soult's exam in which Plaintiff reported her leg swelled; however, Dr. Soult's physical examination notations do not indicate edema or swelling. (T. 411.) Overall the ALJ's RFC limiting Plaintiff to less than a full range of light work, was supported by the medical evidence pertaining to Plaintiff's leg and knee impairments.

Substantial evidence supported the limitations due to leg and knee impairments in the ALJ's RFC. Specifically, the ALJ limited Plaintiff to light work with only occasional pushing/pulling with the left lower extremity. (T. 29.) Dr. Tabb noted Plaintiff had a normal gait, full squat and did not need assistance in getting on/off the exam table. (T. 311.) Dr. Tabb noted "mild restrictions" with bending and lifting. (T. 314.) Dr. Tabb's

examination showed no edema. (*Id.*) Further, an X-Ray of Plaintiff's knee conducted at the time of the consultative exam was negative. (*Id.*) Dr. Soult observed a "fairly steady gait" and made no notations that he observed edema or swelling. (T. 411.) Dr. Kachare noted no edema during Plaintiff's July 2012 exam and Plaintiff denied any weakness in her extremities, numbness, tingling or trouble walking. (T. 370-371.) The RFC's limitations more than account for Plaintiff's limitations in this area.

Therefore, the ALJ did not err in failing to provide Dr. Kachare's medical source statement controlling weight where the limitations imposed therein were inconsistent with the objective medical evidence in the record and Dr. Kachare treated Plaintiff twice with a year gap between treatments. Further, the ALJ's RFC analysis regarding Plaintiff's physical conditions was supported by substantial evidence in the record as the ALJ properly relied on the opinion evidence of the consultative examiner, Dr. Tabb, and to a lesser extent the opinion evidence supplied by Dr. Kachare and Dr. Soults, and the objective medical imaging in the record.

Plaintiff argues the ALJ also erred in his evaluation of the medical evidence relating to her mental limitations. Specifically, Plaintiff argues the ALJ failed to provide controlling weight to her treating psychiatrist Kumar Bahl, M.D. (Dkt. No.12 at 22-24 [Pl.'s Mem. of Law].) The ALJ afforded Dr. Bahl's medical opinion "some weight" reasoning his own treatment notes did not support the limitations imposed. (T. 33.) The ALJ further reasoned Dr. Bahl based his limitations on Plaintiff's alleged symptoms, which were not fully credible, and therefore, the limitations were not credible. (*Id.*)

Dr. Bahl completed a medical source statement on behalf of Plaintiff on June 4, 2012. (T. 337-338.) Therein he opined Plaintiff had marked limitations in her ability to

deal with the public and deal with stress. (T. 337.)[2] He opined Plaintiff had moderate limitations in her ability to relate to family and acquaintances; use of judgment; relate to authority figures; and maintain attention/concentration. (*Id.*) He further stated Plaintiff had marked limitations in her ability to maintain personal appearance; behave in an emotionally stable manner; and relate predictably in social situations. (T. 338.) Dr. Bahl observed Plaintiff had moderate limitations in her ability to demonstrate reliability. (*Id.*) Dr. Bahl stated Plaintiff had "poor interpersonal skills[,] especially in the context of worsened psychiatric symptoms." (*Id.*) The ALJ properly concluded Dr. Bahl's limitations were not supported by his treatment notes.

In January 2011, Dr. Bahl observed Plaintiff had a limited range affect, but good insight and judgment. (T. 293.) He noted work stressors which increased Plaintiff's anxiety and he increased her dosage of Klonopin and added Abilify. (*Id.*) Dr. Bahl did not treat Plaintiff again until March of 2011 at which time Plaintiff reported feeling "OK," but the death of her grandfather and having to care for her son caused her stress. (T. 294.) Plaintiff reported she was looking forward to going on vacation for a few weeks. (T. 294.) Plaintiff also reported she stopped taking Ability. (*Id.*) Dr. Bahl observed mild psychomotor retardation, a normal range of affect, and good insight and judgment. (*Id.*) Dr. Bahl recommended Plaintiff follow up "as needed." (*Id.*)

Plaintiff sought treatment in May of 2011 because she was "stressed out;" however, she also reported improving relationships at work and with her son and otherwise had no other concerns or problems. (T. 295.) Dr. Bahl observed a normal range affect and fair insight and judgment. (*Id.*) Plaintiff saw Dr. Bahl again in May of

---

[2] The medical source statement completed by Dr. Bahl defines "marked" as "effectively precluded from performing the activity in a meaningful manner. Limitations are present for 51-75% of the time in an 8-hour workday." The form defines "moderate" as "significantly limited by not precluded from performing the activity. Limitations are present for 26-50% of the time in an 8-hour workday."

13

2011 complaining of stress with work and cervical cancer. (T. 296.)[3] Again it was noted she discontinued her Abilify. (T. 296.) Dr. Bahl observed Plaintiff had a limited range affect and good insight and judgment. (*Id.*)

In June of 2011 Plaintiff complained of increased stress due to work conflicts. (T. 297.) With the help of Dr. Bahl, Plaintiff took temporary leave from work to help "stabilize" her symptoms. (T. 297.) Dr. Bahl stated Plaintiff could work on a reduced part time schedule, and limited her to four hours a day and three days a week. (T. 286.) Dr. Bahl did not provide specific work limitations. Dr. Bahl's treatment notes from June 2011 indicated Plaintiff's work stressors were primarily caused by conflict with a particular supervisor. (T. 297.) His treatment notes further indicated Plaintiff's stress decreased during her time off, as she was spending more time with her son and partner. (*Id.*) Dr. Bahl again treated Plaintiff in late June. He noted a limited range affect, dysphoric mood and fair insight and judgment. (T. 298.) He increase her dosage of Lexapro. (*Id.*) In July of 2011 Plaintiff stated she felt she had no choice but to go back to work and that she was able to "tolerate the frustration and disappointment." (T. 299.) She denied any major depressive, manic, psychotic, or anxiety related problems. (*Id.*)

In late July 2011 Plaintiff reported she was "OK" at work, she felt "happy," but did continue to have intermittent depressed moods. (T. 300.) Plaintiff reported she was able to tolerate work "without any difficulty." (*Id.*) Dr. Bahl observed Plaintiff continued to have psychological stressors, but had shown improvement in her occupational ability and was able to tolerate work. (*Id.*) He noted he was reintroducing Abilify, as Plaintiff stopped the medication due to cost concerns, but she felt it did have an effect on her. (*Id.*) In August of 2011 Plaintiff again reported feeling "OK" and she had "mild and

---

[3] Of note, the record indicated Plaintiff was never diagnosed with cervical cancer. (T. 458.)

14

intermittent" stress and anxiety. (T. 301.) She reported she returned to work and was tolerating it well. (*Id.*) In October 2011, Plaintiff reported to Dr. Bahl she was wrongfully terminated at work. (*Id.*) Plaintiff stated her termination caused an increase in her stressors; however, overall she was able to tolerate it with medication and remained hopeful. (*Id.*)

Plaintiff did not seek care from Dr. Bahl again until January 2012 due to insurance issues. (T. 333.) She reported increase stressors and Dr. Bahl prescribed Xanax. (*Id.*) In March 2012, Plaintiff complained of increased symptoms; however, she self-discontinued her Ability and Dr. Bahl noted her symptoms worsened due to this. (T. 334.) In April 2012, Plaintiff again reported increased symptoms and nightmares. (T. 335.) In May 2012 Plaintiff expressed concerns about her ability to work with her anxiety symptoms. (T. 340.) In June of 2012, Plaintiff reported she was "OK" and that her medication was helping her, she was motivated and her functioning increased. (T. 341.) Dr. Bahl reported Plaintiff was "maintaining her gains." (*Id.*)

Although Dr. Bahl's treatment notes document Plaintiff's symptoms due to her mental impairments, they do not support the degree of limitations imposed in his medical source statement. His notations indicated Plaintiff did well on medication and her symptoms increased when she stopped part of her medication regiment. Notations further indicated Plaintiff's specific work stressors centered around a particular supervisor and not her work in general; in fact, and to her credit, the Plaintiff worked successfully for many years in that particular place of employment. Therefore, the ALJ did not err in affording Dr. Bahl's opinion limited weight based on internal inconsistencies.

15

The ALJ's RFC did provide for functional limitations based on Plaintiff's mental impairments, which were supported by substantial evidence in the record. (T. 29.) In making his RFC determination the ALJ relied on the opinions of Plaintiff's treating psychiatrist Dr. Bahl, consultative examiner Dr. Hansen, state agency medical examiner J. Echevarria, and Plaintiff's testimony. The ALJ afforded Dr. Bahl's opinion "some weight," acknowledging Dr. Bahl as the treating psychiatrist with a substantial relationship with Plaintiff. (T. 33.) The ALJ also relied on the opinion evidence of consultative examiner Dr. Hansen.

In March of 2012, Dr. Hansen opined Plaintiff was capable of following and understanding simple directions and instructions, performing simple tasks, could maintain attention and concentration, and could maintain a regular schedule. (T. 308.) Dr. Hansen further observed Plaintiff was capable of making appropriate decisions and able to relate adequately with others. (*Id.*) Dr. Hansen opined Plaintiff "appeared to be malingering with many of her symptoms." (T. 306.)

The Plaintiff argues, in weighing opinion evidence, the ALJ placed unwarranted emphasis on notations of Plaintiff's possible malingering and questionable credibility. (Dkt. No. 12 at 23-24 [Pl.'s Mem. of Law].) In addition to Dr. Hansen's notation of malingering, Dr. Stang, who performed a medical examination on behalf of New York State, and then later became Plaintiff's psychologist, stated Plaintiff's "degree of veracity in regards to her psychiatric allegations are somewhat unclear, but could not be proven false." (T. 354.) Plaintiff argues her credibility was never questioned by Dr. Bahl, and further Dr. Stang later became her psychologist, thus indicating that any question of veracity were "resolved in her favor." (Dkt. No. 12 at 24 [Pl.'s Mem. of Law].)

Although a Plaintiff's subjective complaints are an important diagnostic tool, especially in the realm of mental illness, the ALJ does not have to accept Plaintiff's allegations without question. The ALJ did not discredit Dr. Bahl's medical source statement simply because Plaintiff's veracity was questioned by other medical providers. The ALJ provided a detailed discussion of the medical evidence in the record and determined that Dr. Bahl's statement was entitled to "little weight" based on the overall objective medical findings and observations of medical providers, including concerns regarding Plaintiff's veracity. The fact that Dr. Stang did not expressly question her veracity during treatment does not provide the "clearest indication possible" that Dr. Stang no longer questioned her veracity. (Dkt. No. 12 at 24 [Pl.'s Mem. of Law].) As Defendant properly points out, the doctor's primary role is to provide treatment, not assess a plaintiff's credibility. *See Bliss v. Comm'r of Soc. Sec.*, 406 Fed. Appx. 541, 542 (2d Cir. 2011). Therefore, for the reasons stated herein, the ALJ properly evaluated the opinion evidence regarding Plaintiff's mental health.

**B.     Whether the ALJ Properly Evaluated Plaintiff's Credibility.**

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated in Defendant's memorandum of law.  (Dkt. No. [Def.'s Mem. of Law].)  The Court adds the following analysis.

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence."  *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009) (*quoting Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir.1992).  However, the ALJ  "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record."

*Montaldo v. Astrue*, 10-CV-6163, 2012 WL 893186, at *17 (S.D.N.Y. Mar. 15 2012).

"When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood*, 614 F. Supp. 2d at 270.

"The ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. First, the ALJ must determine whether the claimant has medically determinable impairments, which could reasonably be expected to produce the pain or other symptoms alleged." *Id.*, at 271.

> Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. Because an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, an ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

*Id.*

Here, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, her statements were not entirely credible. (T. 30.) Plaintiff argues the ALJ improperly relied on Dr. Stang and Dr. Hansen's questions of veracity, and improperly relied on Plaintiff's exaggeration of her need for surgery. (Dkt. No. 12 at 25 [Pl.'s Mem. of Law].) However, the Plaintiff only

points to two factors of the ALJ's vast credibility analysis. Overall, the ALJ provided a proper and very thorough credibility analysis.

The ALJ determined Plaintiff's testimony was inconsistent with the medical evidence in the record. (T.30-32.) The ALJ specifically discussed her allegations of back, neck and knee pain. (T. 30.) The ALJ looked to the objective medical imaging in the record as well as the opinions of Dr. Kachare, Dr. Soults, and Dr. Tabb in making a credibility determination. (T. 31.) Regarding Plaintiff's alleged mental health symptoms, the ALJ discussed medical evidence from Dr. Stang, Dr. Bahl and providers at CAP Medical Psychiatry. (T. 32.) And as discussed in Point IV.A. the ALJ also evaluated notations regarding Plaintiff's veracity.

In addition to the objective medical evidence, the ALJ also took into consideration Plaintiff's strong work history, inconsistency within her own testimony, and her receipt of unemployment benefits. (T. 32-33.) In assessing her credibility, the ALJ stated Plaintiff misrepresented her physical conditions, claiming she had to have neck surgery and had a 50/50 chance of being paralyzed. (T. 32 *referring to* T. 406.) However, Dr. Soults indicated that she may benefit from surgery at some point in the future. (*Id. referring to* T. 415.) The Plaintiff claims this statement was merely "agitated venting" which the ALJ improperly used to discredit Plaintiff. (Dkt. No. 12 at 25 [Pl.'s Mem. of Law].) Once again, this Court will not partake in speculation. It is impossible to know Plaintiff's mindset when making such comments. It is a reviewing court's role to determine whether substantial evidence supports the ALJ's decision to discount a plaintiff's subjective complaint. *Reynolds v. Colvin*, 570 Fed. Appx. 45, 49 (2d Cir. 2014) quoting *Aponte v. Sec., Dept. of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).

Having reviewed the record, the ALJ conducted a proper and detailed credibility analysis that followed the proper legal standards as provided in the Regulations. There was substantial evidence to support the ALJ's conclusion that Plaintiff's allegations were not entirely credible.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 12) is **DENIED**; and it is further

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 13) is **GRANTED**; and it is further

**ORDERED** that Defendant's decision denying disability benefits is **AFFIRMED**; and it is further is

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

Dated: July 6, 2015
Syracuse, NY

Glenn T. Suddaby
U.S. District Judge